# EXHIBIT A

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.

SUPERIOR COURT DEPARTMENT
C.A. NO. 20-1554

RESONANCE RESEARCH, INC., )
    Plaintiff, )
                   )
v.                      )
                      )
PRODRIVE TECHNOLOGIES, )
B.V., )
    Defendant. )

FILED
IN THE OFFICE OF THE
CLERK OF COURTS
FOR THE COUNTY OF MIDDLESEX

JUL 0 6 2020

CLERK

## COMPLAINT AND DEMAND FOR JURY TRIAL

1. The Plaintiff, Resonance Research, Inc. ("Resonance"), is a Massachusetts corporation with its principal place of business located at 31 Dunham Road, Billerica, Middlesex County, Massachusetts.

2. The Defendant, Prodrive Technologies, B.V. ("Prodrive"), is a company with limited liability incorporated under the laws of the Netherlands, doing business in Massachusetts, with its registered office in Son, the Netherlands.

## FACTS

3. Prodrive was engaged in trade or commerce in Massachusetts at all times during the parties' negotiations, when the parties agreed to the underlying transaction, and at all times thereafter.

4. Prodrive continues to be engaged in trade or commerce in Massachusetts, and is operating a Prodrive entity in Canton, Massachusetts.

1

5. Resonance was engaged in trade or commerce in Massachusetts at all times during the parties' negotiations, when the parties agreed to the underlying transaction, and at all times thereafter.

6. Resonance continues to be engaged in trade or commerce in Massachusetts.

7. Piotr M. Starewicz ("Starewicz") is Resonance's president, treasurer, secretary, and director.

8. Starewicz is the sole owner of Resonance.

9. Resonance is a Massachusetts corporation and has existed as a Massachusetts corporation since 1987.

10. Starewicz resides at 129 Grove Street, Lexington, Massachusetts and is domiciled in the Commonwealth of Massachusetts.

11. Starewicz negotiated Resonance's purchase of Prodrive's amplifiers while physically present in Massachusetts.

12. Resonance specializes in advanced technologies used to manage magnetic fields in MRI and NMR equipment.

13. Resonance designs, builds, and supports advanced, integrated solutions in magnetics for high-end clinical and analytical operations that use MRI and NMR.

14. Resonance has been in the business of providing research-level MRI equipment for thirty-two (32) years.

15. Resonance uses amplifiers as component parts within Resonance's own projects, products, and solutions.

16. Prodrive sold failed NG500 amplifiers sold by Prodrive to Resonance, for Resonance to use as component parts in Resonance's projects with third parties, including with the National Institute of Health and with the University of North Carolina Chapel Hill.

17. Prodrive's NG500 amplifier's performance failed to meet Prodrive's warranted specifications.

18. In 2018 the parties engaged in negotiations and discussions regarding a potential sale of amplifiers by Prodrive to Resonance.

19. Before arriving at any agreement, Prodrive provided to Resonance specifications for Prodrive's NG500 gradient amplifier.

20. Included in those specifications were specific warranties concerning output accuracy.

21. Prodrive's warranties have been proven to be inaccurate and false.

22. Prodrive's warranty that the NG500 amplifier's settling time matched the warranted "error <1% after 100μs" has been proven to be inaccurate and false.

23. Prodrive's warranties were material to Resonance's purchase of the Prodrive amplifier.

24. Additionally, the specifications warranted and promised by Prodrive included other performance metrics that the NG500 amplifiers could not meet, including Prodrive's warranties concerning auto-tuning and advanced diagnostics, stability, noise, feedback loop control ranges, and bandwidth (at >10kHz).

25. During the negotiation process, Prodrive performed simulations of the product that it hoped to sell to Resonance.

26. Prodrive warranted, represented, and demonstrated that its amplifiers could reach Resonance's desired specifications, based on the simulation results that Prodrive demonstrated to Resonance.

27. Resonance's decision to purchase Prodrive's amplifiers was based on the simulation that Prodrive provided in its February 12, 2017 email, in which it claimed compatibility with 100μH loads and the ability to drive 4A/μs slew rates.

28. A 100 μH inductance is relatively common, though not routine.

29. Prodrive gave assurances that the proper operating condition could be reached.

30. Prodrive clearly understood from Resonance that such loads were not routine but could be critical.

31. Prodrive responded affirmatively to Resonance's queries and Resonance accepted Prodrive's response as assurance of practical operational performance.

32. Prodrive offered both written and verbal assurances that the expected performance could be reached.

33. Prodrive's assurances were false.

34. These specific representations were made directly to Resonance by Prodrive, for the purpose of inducing Resonance into purchasing the NG500 amplifiers.

35. Resonance relied on Prodrive's representations and decided to purchase Prodrive's amplifiers because of Prodrive's representations.

36. On or around July 2, 2018, the parties entered into a written agreement for the sale of Prodrive's NG500 gradient amplifiers.

37. Resonance purchased Prodrive's amplifiers in order to use the amplifiers to drive MRI gradient coils.

38. The market for MRI equipment is specialized, selective, and limited.

39. Prodrive's amplifiers failed to perform as specified, warranted, and represented.

40. Resonance attempted to use Prodrive's amplifiers at three separate Resonance project sites: the National Institute of Health's 7T (tesla) scanner project, a separate National Institute of Health project operating at 4.7T, both in Bethesda, Maryland, and the University of North Carolina Chapel Hill project operating at 9.4T. Another site, non-MRI application, was stages at Exponent, Inc., Philadelphia, PA, for a related but non-MRI application that also failed to reach claimed performance.

41. Due to the amplifiers' failure to perform to their negotiated specifications, Resonance's own solutions failed to perform.

42. The University of North Carolina Chapel Hill site and the National Institute of Health, Bethesda, Maryland site each had MRI gradients well within the minimal specifications.

43. The University of North Carolina Chapel Hill site's inductive load ratings were between 241 µH and 407 µH.

44. The National Institute of Health, Bethesda, Maryland's 4.7T site had inductive load ratings of 639 µH and 677 µH.

45. Both installations' loads were well within the Prodrive manual's suggested load specifications.

46. Neither one of the Prodrive products installed at those sites (N.I.H. Bethesda and U.N.C. Chapel Hill) were compliant with the specifications of electronic performance as stated in the Prodrive manual.

47. Another one of the three projects that failed because of Prodrive's failed amplifier was the 7T scanner at the National Institute of Health.

48. Substantial time and effort was applied to the 7T scanner at the National Institute of Health to attempt make it operable despite Prodrive's noncompliant amplifier.

49. At the National Institute of Health 7T scanner site, the unit has a gradient coil with the characteristics of inductance below those stated in the product manual as "standard ranges."

50. At the National Institute of Health 7T scanner site, the three axes of the MRI gradient have nominal inductances between 130 μH and 160 μH: far below the 220 μH warranted in the Prodrive manual. This was made very clear to the Prodrive engineering team and the research and development team who worked on this project.

51. Not only could the product not reach these operating parameters, it was not able, even under the best conditions, to meet the parameters set forth under the product's specifications.

52. Resonance's customers have spent countless hours and unnecessarily wasted funds attempting to get this equipment to work as warranted by Prodrive, all in vain.

53. Even the older amplifiers that Resonance abandoned before purchasing Prodrive's amplifiers performed better than Prodrive's amplifiers.

54. The effort of attempting to bring the systems into compliance included a team composed of Prodrive R&D engineers, Resonance engineers, customer scientists and a recognized consultant hired by Resonance: an expert in MRI and tune-up of critical scanner operations.

55. Multiple days of effort and consulting time were spent on those attempts.

56. Despite repeated sessions of remote tuning and evaluation, the basic specification of slew rate and stability were not reached.

57. In fact, several other faults were discovered with the Prodrive amplifiers, including temporal noise performance problems and output instability at currents above 100A (versus the claimed target of 400A).

58. Ample documentation of those efforts were recorded and communicated to the Prodrive team.

59. The failure of the amplifiers caused Resonance substantial economic losses.

60. Resonance incurred approximately $357,969.00 in direct costs for Prodrive's nonconforming amplifiers.

61. Resonance's costs include the NG500 amplifiers' acquisition costs of $42,250.00 each, plus approximately $15,000.00 in shipping and trade tariff costs for each unit.

62. As a result of the amplifiers' failures, Resonance's financial and marketing position has suffered, both with individual customers whose labs were affected and with the original equipment manufacturer (OEM) partners who have since excluded Resonance from supplying an exclusive, combined gradient coil/amplifier product.

63. Resonance's primary distributor now is refusing to honor service agreements because the equipment, with Prodrive's amplifiers, cannot be fixed.

64. This has led to Resonance's loss of business from its distributor.

65. This has also led to a complete loss of confidence in Resonance from leading institutions in the market.

66. Further, as a result of Resonance's damaged reputation caused by Prodrive's non-conformance, Resonance's ability to generate new business has been severely damaged, and new business loss is estimated at over $3,000,000.00.

## COUNT I
### (Fraud)

67. Resonance incorporates the facts alleged in the preceding paragraphs as if fully set forth herein.

68. Prodrive's conduct constituted fraud. Prodrive made fraudulent representations to Resonance: that Prodrive would provide products meeting certain specifications, for the amount agreed to by the parties.

69. Prodrive had knowledge of the falsity of its representations.

70. Prodrive made these knowingly false representations to Resonance for the purpose of inducing Resonance to act thereon.

71. Resonance reasonably relied upon Prodrive's representations as true, and acted in reliance thereon in contracting to purchase Prodrive's products, to Resonance's damage.

72. Prodrive's said conduct directly and proximately caused Resonance to sustain the damages referred to above.

## COUNT II
### (Negligent Misrepresentation)

73. Resonance incorporates the facts alleged in the preceding paragraphs as if fully set forth herein.

74. While acting in the course of its business, Prodrive supplied false information to Resonance with respect to its willingness and ability to provide the products for the agreed specifications, and failed to exercise reasonable care or competence in obtaining or communicating the false information to Resonance.

75. Resonance justifiably relied on the information that Prodrive provided to it, and the false information resulted in pecuniary loss to Resonance.

76. Prodrive's said conduct directly and proximately caused Resonance to sustain the damages referred to above.

## COUNT III
### (Intentional Misrepresentation)

77. Resonance incorporates the facts alleged in the preceding paragraphs as if fully set forth herein.

78. While acting in the course of its business, Prodrive made a false statement of material fact to Resonance with knowledge of its falsity for the purpose of inducing Resonance to act thereon.

79. Resonance justifiably relied on the information that Prodrive provided to it, and the false information resulted in pecuniary loss to Resonance.

80. Prodrive's said conduct directly and proximately caused Resonance to sustain the damages referred to above.

## COUNT IV
### (Breach of Contract)

81. Resonance incorporates the facts alleged in the preceding paragraphs as if fully set forth herein.

82. The parties entered into a written contract dated July 2, 2018.

83. By virtue of the foregoing, Prodrive breached its obligations to Resonance under the contract by failing to provide the amplifiers as represented and warranted.

84. As a result of Prodrive's breach, Resonance has sustained the damages referred to above.

## COUNT V
### (Breach of Warranty)

85. Resonance incorporates the facts alleged in the preceding paragraphs as if fully set forth herein.

86. Prodrive warranted to Resonance that Prodrive would provide products that performed as represented, specified, and warranted.

87. Prodrive breached said warranties in failing to provide the amplifiers as represented, specified, and warranted.

88. As a result of Prodrive's breach, Resonance has sustained the damages referred to above.

## COUNT VI
### (Breach of Covenant of Good Faith and Fair Dealing)

89. Resonance incorporates the facts alleged in the preceding paragraphs as if fully set forth herein.

90. Prodrive's conduct violated the implied covenant of good faith and fair dealing.

91. Prodrive's said conduct directly and proximately caused Resonance to sustain the damages referred to above.

## COUNT VII
### (Violation of G.L. c. 93A)

92. Resonance incorporates the facts alleged in the preceding paragraphs as if fully set forth herein.

93. Prodrive's actions in failing to deliver to Resonance products that performed as represented and specified, by Prodrive to Resonance, constituted an unfair and deceptive business practice prohibited by G.L. c. 93A, § 11.

94. Prodrive's actions in failing to deliver to Resonance products that performed as explicitly warranted by Prodrive to Resonance constituted an unfair and deceptive business practice prohibited by G.L. c. 93A, § 11.

95. Prodrive's actions in failing to deliver to Resonance compliant products constituted a breach of the parties' written contract and an unfair and deceptive business practice prohibited by G.L. c. 93A, § 11.

96. Prodrive's actions in billing Resonance for products that failed to perform as represented, specified, and warranted, and in breach of the parties' written contract, constituted unfair and deceptive business practices prohibited by G.L. c. 93A, § 11.

97. Prodrive's conduct directly and proximately caused Resonance to sustain the damages referred to above, and Resonance demands damages as allowed by G.L. c. 93A, § 11.

WHEREFORE, the Plaintiff, Resonance Research, Inc., requests that judgment be entered as follows:

1.) Against Prodrive in its favor against the Defendant for all damages sustained by the Plaintiff together with interest, costs, attorneys' fees;

2.) And for any such other relief as this Court deems appropriate.

## JURY DEMAND

THE PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Respectfully submitted,
The Plaintiff,
RESONANCE RESEARCH, INC.,
By its attorneys,

Date: 7/2/20

Edward A. Prisby, BBO # 655217
Jenny M. Pistrang, BBO # 698841
Kajko, Weisman & Colasanti, LLP
430 Bedford Street
Lexington, MA 02420
(781) 860-9500
eprisby@massfirm.com
jpistrang@massfirm.com

12

| CIVIL ACTION COVER SHEET | TRIAL COURT OF MASSACHUSETTS SUPERIOR COURT DEPARTMENT COUNTY OF Middlesex | DOCKET NO. 20-1554 L |
|---|---|---|

| PLAINTIFF(S) | DEFENDANT(S) |
|---|---|
| Resonance Research, Inc. | Prodrive Technologies, B.V. |
| Plaintiff Atty  Edward A. Prisby | Type Defendant's Attorney Name |
| | Defendant Atty _____ |
| Address  430 Bedford Street, Suite 390 | Address _____ |
| City Lexington  State MA  Zip Code 02420 | City _____ State _____ Zip Code _____ |
| Tel. 781-860-9500   BBO# 65517 | |

**TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)**

| CODE NO. | TYPE OF ACTION (specify) | TRACK | IS THIS A JURY CASE? |
|---|---|---|---|
| A02 | Goods Sold and Delivered - | F | [X] Yes   [ ] No |

The following is a full, itemized and detailed statement of the facts on which plaintiff relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

**TORT CLAIMS**
(Attach additional sheets as necessary)

FILED IN THE OFFICE OF THE CLERK OF COURTS FOR THE COUNTY OF MIDDLESEX
JUL 06 2020
CLERK

A. Documented medical expenses to date:
  1. Total hospital expenses                                               $ _____
  2. Total doctor expenses                                                 $ _____
  3. Total chiropractic expenses                                           $ 0.00
  4. Total physical therapy expenses                                       $ 0.00
  5. Total other expenses (describe) Potential future treatment due to cont. head injury effects $ _____
                                                              Subtotal     $ 0.00
B. Documented lost wages and compensation to date                          $ 0.00
C. Documented property damages to date                                     $ _____
D. Reasonably anticipated future medical expenses                          $ _____
E. Reasonably anticipated lost wages and compensation to date              $ _____
F. Other documented items of damages (describe) Pain and Suffering
                                                                           $ 0.00
G. Brief description of plaintiff's injury, including nature and extent of injury (describe)

   As a result of the Defendant's negligence, the Plaintiff has sustained serious personal injury.

                                                             Total $ _____

**CONTRACT CLAIMS**
(Attach additional sheets as necessary)

Provide a detailed description of claim(s):

| As a result of the defendant's breach of contract, the Plaintiff has sustained damages. | TOTAL $ 4,000,000.00 |
|---|---|

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT _____

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Uniform Rules on Dispute Resolution (SJC) Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods."

Signature of Attorney of Record _____   Date: July 2, 2020

A.O.S.C. 3-2007                                                  TurboLaw (800) 518-8726